UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TOBY NUNEZ, as Administratrix of
the Estate of Raul A. Nunez,
Deceased,

                         Plaintiff,

        -against-

ROBERT BENTIVEGNA, KYOUNG S. KIM,
MARY ASHONG, ALBERT ACRISH,
WILLIAM MILLER and LESLIE CAREY,

                         Defendants.

---

No. 22 Civ 5673 (LAP)

MEMORANDUM & ORDER

---

LORETTA A. PRESKA, Senior United States District Judge:

Toby Nunez ("Plaintiff"), as administratrix of the estate of Raul A. Nunez, deceased ("Decedent"), brings this action against Dr. Robert Bentivegna ("Dr. Bentivegna"), Dr. Kyoung S. Kim ("Dr. Kim"), Nurse Practitioner Mary Ashong ("Ashong"), Nurse Practitioner Albert Acrish ("Acrish"), Nurse William Miller ("Miller"), and Nurse Administrator Leslie Carey ("Carey") (collectively, "Defendants"), for alleged violations of Decedent's Eighth Amendment rights while he was incarcerated at Green Haven Correctional Facility ("Green Haven"). Presently before the Court is Defendants' motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56.[1]    Plaintiff opposes the motion and cross moves to preclude Defendants' expert report.[2]    For the reasons set forth below, Defendants' motion for summary judgment is GRANTED and Plaintiff's motion to preclude is DENIED.

## I. Background

The following facts are taken from the Parties' respective statements pursuant to Local Civil Rule 56.1 and unless otherwise noted are not in dispute.

---

[1] (See Mot. Summ. J., dated Dec. 6, 2023 [dkt. no. 61]; Mem. Law Supp. Mot Summ. J. ("Defs.' Br."), dated Dec. 6, 2023 [dkt. no. 70]; Defs.' Rule 56.1 Statement ("Defs.' SOF"), dated Dec. 6, 2023 [dkt. no. 69]; Defs.' Counter Pl.'s Rule 56.1 Statement ("Defs.' Counter SOF"), dated Jan. 12, 2024 [dkt. no. 88]; Decl. of Leslie Carey ("Carey Decl."), dated Dec. 6, 2023 [dkt. no. 62]; Decl. of Dr. Robert Bentivegna ("Bentivegna Decl."), dated Dec. 6, 2023 [dkt. no. 63]; Decl. of William A. Miller ("Miller Decl."), dated Dec. 6, 2023 [dkt. no. 64]; Decl. of Mary Ashong ("Ashong Decl."), dated Dec. 6, 2023 [dkt. no. 65]; Decl. of Albert Acrish ("Acrish Decl."), dated Dec. 6, 2023 [dkt. no. 66]; Decl. of Dr. Kyoung Kim ("Kim Decl."), dated Dec. 6, 2023 [dkt. no. 67]; Decl. of Dr. Mark Korsten ("Korsten Decl."), dated Dec. 6, 2023 [dkt. no. 68].)

[2] (See Pl.'s Mot. Preclude, dated Dec. 27, 2023 [dkt. no. 75]; Pl.'s Mem. Law Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Br."), dated Dec. 27, 2023 [dkt. no. 81]; Pl.'s Counter Defs.' Rule 56.1 Statement ("Pl.'s Counter SOF"), dated Dec. 27, 2023 [dkt. no. 77 at 1–24]; Pl.'s Rule 56.1 Statement ("Pl.'s SOF"), dated Dec. 27, 2023 [dkt. no. 77 at 24–34]; Decl. of Amy Jane Agnew ("Agnew Decl."), dated Dec. 27, 2023 [dkt. no. 79]; Decl. of Dr. Homer D. Venters ("Venters Decl."), dated Dec. 27, 2023 [dkt. no. 80].)

### A. Mr. Nunez's Care at Green Haven

Mr. Nunez transferred to Green Haven on January 26, 2018. (Pl.'s SOF ¶ 24; Defs.' SOF ¶ 1.)  Upon intake, Mr. Nunez was seen by the medical unit at Green Haven.  (Defs.' SOF ¶ 1; Kim Decl., Ex. A (Ambulatory Health Record Progress Notes ("AHR")) [dkt. no. 67-1] at 0024.)  The medical unit documented that Mr. Nunez had a metal rod in his left foot, a bullet fragment in his left rib cage, and that he had a hearing aid.  (Defs.' SOF ¶ 2.) At that time, Mr. Nunez had no complaints and was not taking any medications.  (Id.)

Between his intake in January 2018 until April 2019, Mr. Nunez complained of various medical ailments.  During this time, he was treated for an ear infection, leg pain, constipation, abdominal pain, and strep throat.  (See Pl.'s SOF ¶¶ 28-39.) Regarding Mr. Nunez's leg pain, Mr. Nunez's Primary Care Physician ("PCP"), Dr. Kim, ordered an X-ray of Mr. Nunez's left leg, which showed no abnormalities.  (Defs.' SOF ¶ 6; Pl.'s SOF ¶¶ 32-33; Kim Decl., Ex. B [dkt. no. 67-2].)  Dr. Kim also referred Mr. Nunez to an orthopedist, provided Mr. Nunez arch supports, and prescribed ibuprofen to manage his pain.  (See Venters Decl., Ex. 3 Part 2 [dkt. no. 80-3] at 115, 127.)

In April 2019, Mr. Nunez's complaints of pain began to intensify.  On April 9, 2019, Mr. Nunez went to sick call and reported lower back pain and left leg pain.  (Pl.'s SOF ¶ 40;

AHR at 0031.)   The nurse renewed his prescription for Motrin and requested a follow up appointment with Dr. Kim.[3]   (Id.)   On April 28, Mr. Nunez wrote a sick call slip and stated, "this is the second letter I write.  I have a lower back pain that has gone down to my left side it is a pain going on for almost two month. I have a hard ball on my lower back left side, and I'm being force to take 4 ibuprofen a day to not have to much pain, but the pain does not go away and it is very, very painful, I cannot even stand straight for to long."[4]   (Venters Decl., Ex. 3 Part 2 at 128.)   Mr. Nunez wrote another sick call slip the following day, reiterating that despite the pain medication, he was feeling substantial pain in his "left side hip and hamstring," numbness in his calves and feet, and pain "to the point that I can't even sleep good.  Please help me."   (Id. at 129.)   Mr. Nunez was seen by Nurse Soltish the following day.  She recorded his complaints and referred him to his PCP.  (Pl.'s SOF ¶ 43; AHR at 0031.)

On May 2, 2019, Mr. Nunez filed a grievance.   In his grievance, Mr. Nunez noted that he had "been complaining to sick call staff for over a month about" his pain, indicated that the

_____

[3] The Parties dispute whether the nurse actually made the referral as no referral is documented in the FHS1 System records.  (See Pl.'s SOF ¶ 40; Agnew Decl., Exs. 1–2; Kim Decl. ¶ 28.)
[4] The Court has not altered the language and spelling of Mr. Nunez's correspondences.

pain medication "does nothing," and stated that he was in "urgent need to get X-ray and real medication for the pain." (Venters Decl., Ex. 3 Part 2 at 130.)  Nurse Administrator Carey responded to the grievance by memorandum dated May 9, 2019. (Defs.' SOF ¶ 54; Carey Decl., Ex. B. [dkt. no. 62-2].)  Carey noted that Mr. Nunez's medical records indicated that he had been seen multiple times for back and leg pain, noted that previous X-rays indicated that he had "internal metal fixation to his left ankle" with a screw broken, but that there was "good healing and alignment." (Carey Decl., Ex. B.)  She further replied that Mr. Nunez had an expedited follow up appointment with his PCP by May 21, 2019, which was "[s]ignificantly sooner than the standard waiting period" of "2-3 months." (Id.)

On May 24, 2019, Mr. Nunez was seen by a nurse at an Emergency Sick Call.  (AHR at 0032.)  The nurse noted that Mr. Nunez complained of the "knot" on his back, pain in his lower left back and leg, and that the ibuprofen was "messing with [his] stomach." (Id.)  The nurse advised Mr. Nunez to discontinue the ibuprofen, encouraged Mr. Nunez to apply heat and analgesic balm to his back, and instructed him to discuss his symptoms with Dr. Kim at his upcoming appointment. (Id.)

On May 28, 2019, Dr. Kim saw Mr. Nunez.  Mr. Nunez stated that ibuprofen was upsetting his stomach, complained of left side lower back pain, and reported that he felt a pop in his

back while working out. (Defs.' SOF ¶ 13.) Dr. Kim ordered Aleve and advised Mr. Nunez to discontinue any prescriptions that caused him stomach problems. (Defs.' SOF ¶ 14; AHR at 0032.) Dr. Kim also ordered X-rays of Mr. Nunez's lumbar spine and back, which were reported as unremarkable. (Kim Decl., Ex. C [dkt. no. 67-3].)

In June 2019, Mr. Nunez's condition continued to deteriorate. On June 3, 2019, Mr. Nunez submitted a sick call slip indicating that he was "getting tiredness and fever" and that the pain was "unbearable . . . . I been in pain for over 3 months. This is just to much!" (Venters Decl., Ex. 3 Part 2 at 140.) Later that same day, Mr. Nunez submitted a sick call emergency slip that indicated he had stopped taking the "naproxen three days ago" but was still experiencing "strong pain" in his stomach, loss of appetite, constant fever, and that he was feeling so weak that he "almost fainted." (Id. at 141.) He wrote that he was in "a lot of pain, my lower back, stomach and this is been going on for to long. Over 3 months. I am highly upset!" (Id.) The following day, Mr. Nunez was seen by nurse Miller who referred Mr. Nunez to follow up with Dr. Kim within a week. (AHR at 0032.)

On June 9, 2019, Mr. Nunez submitted another sick call slip which read, "I am havin stomach cramps and a lot of pain on my belly, I have been getting fever for over 5 days at nighttime I

6

wake up swetty and the pain on my back is unbearable.  This is for over 4 month already, please help me."  (Venters Decl., Ex. 3 Part 2 at 144.)  Having seen the sick call slip, nurse Miller saw Mr. Nunez again on June 11, 2019 and updated his referral to Dr. Kim to include that Mr. Nunez had been experiencing night sweats for four months.[5]  (Id. at 155.)

On June 10, 2019, Mr. Nunez wrote a letter to Dr. Bentivegna, the Facility Health Services Director at Green Haven.  (Bentivegna Decl. ¶ 6; Bentivegna Decl., Ex. A [dkt. no. 63-1].)  In his letter, Mr. Nunez reported that he was "not getting the proper medical attention."  (Bentivegna Decl., Ex. A.)  He indicated that he had been in pain for over four months, that his stomach was "cramped up," that he had lost "over 20 pounds" and was "getting a lot of fever and lost of appetite."  (Id.)  He complained that he had "already been through sick call and clinic," had written a grievance, and that "Dr. Kim keeps telling me I need to wait, but this back pain is unbearable, I need to get an MRI and see a doctor that knows about my condition fast!  Please help me."  (Id.)

---

[5] The parties dispute whether Miller saw Mr. Nunez at sick call on June 11.  Miller testifies that Mr. Nunez did not show up for sick call that day.  (Miller Decl. ¶ 22.)  Plaintiff maintains that Mr. Nunez attended the appointment and that Miller updated his referral in the FHS1 system to include "night sweats [for] four months, lower back pain."  (Pl.'s Counter SOF ¶ 21.).  For the purposes of this motion, the Court will assume Miller saw Mr. Nunez on both occasions.

Dr. Bentivegna reviewed Mr. Nunez's medical records, (Bentivegna Decl. ¶ 13), and responded by letter, telling Mr. Nunez to "address [his] issues with Dr. Kim." (Bentivegna Decl., Ex. B [dkt. no. 63-2].)  Dr. Bentivegna also referred Mr. Nunez for an EMG "in order to determine possible underlying causes of back pain." (Bentivegna Decl. ¶ 17; Bentivegna Decl., Ex. C [dkt. no. 63-3].)

On June 17, 2019, Mr. Nunez submitted another sick call slip.  He indicated that he had "been communicating my back pain for over 4 months," that he had "lost over 25 pounds," had loss of appetite, got "tired just from standing to long and get heavy breathing . . . my mobility has become difficult . . . how much suffering do I have to go through?  I need to see a outside doctor now.  Please help me." (Venters Decl., Ex. 3 Part 2 at 148.)   Later that day, Mr. Nunez was seen by a nurse who recorded his symptoms and referred him to his upcoming appointment with Dr. Kim.  (AHR at 0033.)

On June 20, 2019, Nurse Ching Wang saw Mr. Nunez.  Nurse Ching Wang noted "[reports of] diarrhea every day, stomach pain, lost 25 pounds in 4 months" and referred Mr. Nunez to be seen in the clinic "today."  (AHR at 0033.)  Physician's Assistant Kristin Infantino and Defendant Ashong saw Mr. Nunez in the clinic.  (Ashong Decl. ¶¶ 12-13; AHR at 0034.)  Infantino recorded Mr. Nunez's complaints, including that Mr. Nunez had a

8

"history [of] chronic low back pain and stomach pain [with] weight loss all over 5 months. Nothing new. Has been seen multiple times." (AHR at 0034.) Infantino further recorded that Mr. Nunez had normal vital signs, did not appear to be in distress or have difficulty ambulating. (Id.) Defendant Ashong ordered an X-ray and told Mr. Nunez to follow up with his PCP at his upcoming appointment. (Ashong Decl. ¶¶ 17, 20.)

On June 21, 2019, Mr. Nunez fainted and was taken to the clinic for further evaluation. (Pl.'s SOF ¶ 61; AHR at 0035.) In the clinic, Mr. Nunez was seen by Defendant Acrish. (Pl.'s SOF ¶ 62.) Acrish recorded Mr. Nunez's complaints of back and abdominal pain, noted that Mr. Nunez reported he could not "walk long distances" and wanted "to be admitted to hospital." (AHR at 0035.) Acrish reviewed recent X-rays, which showed constipation, and examined Mr. Nunez's abdomen, noting that his abdomen was tender upon deep palpitations. (Acrish Decl. ¶¶ 15, 17.) Acrish prescribed Milk of Magnesia, Tylenol, and ordered that Mr. Nunez be allowed to have meals in his cell and be relieved of work until his upcoming appoint with Dr. Kim on June 25, 2019. (Id. at ¶ 19). Acrish further noted that Mr. Nunez might be experiencing "anxiety related symptoms." (AHR at 0035.)

On June 25, 2019, Mr. Nunez was seen by Dr. Kim. (Kim Decl. ¶ 51.) Dr. Kim recorded Mr. Nunez's symptoms and noted

9

that he had fainted on June 21 and June 24.   (AHR at 0035.)
Noting his weight loss and inability to stand, Dr. Kim sent Mr.
Nunez to the Emergency Room at Mount Vernon Hospital.   (Kim
Decl. ¶ 51.)   While being treated at Mount Vernon, Mr. Nunez was
diagnosed with pancreatic cancer.   (Id. at ¶ 54.)   Upon release
from the hospital, Mr. Nunez was transferred to the DOCCS
Regional Medical Unit, where he died on August 10, 2019.   (Id.;
Venters Decl., Ex. 3 Part 3 [dkt. no. 80-4] at 255.)

   **B. Procedural History**

   On July 3, 2022, Plaintiff commenced this action pursuant
to 42 U.S.C § 1983, alleging that Defendants were deliberately
indifferent to Mr. Nunez's medical needs in violation of the
Eighth Amendment.   (Dkt. no. 1.)   On December 6, 2023, after
completing discovery, Defendants moved for summary judgment,
seeking to dismiss Plaintiff's complaint in its entirety.   (Dkt.
no. 61.)   Defendants aver that they are entitled to summary
judgment because they did not violate Mr. Nunez's rights and on
the grounds of qualified immunity.   (See generally Defs.' Br.)
On December 27, 2023, Plaintiff filed her opposition and moved
to preclude the report of Defendants' expert, Dr. Mark Korsten.
(Dkt. nos. 75, 81.)   On January 12, 2024, Defendants replied.
(Dkt. nos. 87, 89.)   The matter is now fully briefed and ripe
for adjudication.

## II.  Applicable Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u>  In assessing whether summary judgment is proper, the Court construes the evidence in the light most favorable to the non-moving party.  <u>Lucente v. IBM Corp.</u>, 310 F.3d 243, 253 (2d Cir. 2002).

## III. Discussion

### A. Plaintiff's Deliberate Indifference Claim

#### 1. Applicable Law

"The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care."  <u>Salahuddin v. Goord</u>, 467 F.3d 263, 279 (2d Cir. 2006), <u>abrogated in part on other grounds by</u> <u>Kravitz v. Purcell</u>, 87 F.4th 11 (2d Cir. 2023). "There are two elements to a claim of deliberate indifference to a serious medical condition."  <u>Melvin v. Cnty. of Westchester</u>,

No. 14 Civ. 2995, 2019 WL 1227903, at *8 (S.D.N.Y. Mar. 15, 2019).

"The first requirement is objective: the alleged deprivation of adequate medical care must be 'sufficiently serious.'" Salahuddin, 467 F.3d at 279 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Under this requirement, a court must inquire first "whether the prisoner was actually deprived of adequate medical care" and second "whether the inadequacy in medical care is sufficiently serious." Id. at 279-80. Regarding the first element, "[m]edical care is adequate where the care provided is a reasonable response to the inmate's medical condition." Melvin, 2019 WL 1227903, at *9 (quotation omitted). With regard to the second element, where, as here, the challenge is to the adequacy of care, "the inquiry focuses on the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." Sanchez v. New York Correct Care Sols. Med. Servs., P.C., No. 16 Civ. 6826, 2018 WL 6510759, at *7 (W.D.N.Y. Dec. 11, 2018).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." Spavone v. New York State Dep't of Corr. Servs., 719 F.3d 127, 138 (2d Cir. 2013). "This mental state requires

12

that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin, 467 F.3d at 280; see also Farmer, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." Salahuddin, 467 F.3d at 280.

"By contrast, mere negligence is not enough to state a claim for deliberate indifference." Candelario v. Quality Choice Corr. Healthcare, No. 16 Civ. 2083, 2018 WL 2266850, at *4 (S.D.N.Y. May 17, 2018). "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

### 2. Analysis

The parties contest both the objective and subjective elements of Plaintiff's Eighth Amendment claim. For the purposes of the instant motion, the Court will assume that the objective element is met, i.e., that Mr. Nunez was actually

deprived of adequate medical care and that this deprivation was sufficiently serious.

It is on the subjective element that Plaintiff's case founders. To demonstrate the subjective recklessness required to sustain a claim of deliberate indifference, Plaintiff must do more than show that Defendants were negligent in diagnosing and treating Mr. Nunez's condition; she must demonstrate that each Defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. Moreover, to survive summary judgment, "Plaintiff must point to actual evidence in the record permitting the inference that Defendants acted with deliberate indifference; he cannot rely on conjecture or speculation." Castillo v. Rodas, No. 09 Civ. 9919, 2014 WL 1257274, at *6 (S.D.N.Y. Mar. 25, 2014).

As discussed further below, Plaintiff has failed to raise a triable issue of fact as to Defendants' mental state. The record demonstrates that between April 2019, when his symptoms began, to June 25, 2019, when he was admitted to the hospital, Mr. Nunez was seen over ten times by medical personnel at Green Haven. Over this period, he was referred for multiple tests, including X-rays of his stomach and back, prescribed medication, including Motrin, Aleve, and analgesic balm, and ultimately was referred to the hospital within weeks of the onset of his more severe symptoms. Nothing in the record suggests that any

14

Defendant believed that their course of treatment presented a substantial risk of harm to Mr. Nunez, or that his treatment was "so devoid of sound medical basis . . . as to raise an inference of deliberate indifference." <u>Green v. Shaw</u>, No. 17 Civ. 00913, 2019 WL 1427448, at *8 (D. Conn. Mar. 29, 2019), <u>aff'd</u>, 827 F. App'x 95 (2d Cir. 2020). At most, Plaintiff's allegations implicate negligence, which does not amount to an Eighth Amendment violation. As such, and for the reasons that follow, the Court grants Defendants' motion for summary judgment on Plaintiff's deliberate indifference claim.

### a. Nurse Administrator Carey

Carey's involvement in Mr. Nunez's care was limited to responding to a grievance he filed on May 2, 2019. (Pl.'s SOF ¶¶ 44-45.) At this time, Mr. Nunez had complained of severe lower back and leg pain for roughly a month. (<u>Id.</u> at ¶¶ 40-43.) As of April 28, he further indicated that the ibuprofen was not relieving his pain and noted that he was experiencing numbness in his calves and feet. (<u>Id.</u> at ¶¶ 41-42.) Carey responded on May 9, 2019, noting that he had been seen multiple times for back and leg pain, that previous X-rays were unremarkable, and referred him to an upcoming appointment with his PCP on May 21, 2019. (Carey Decl., Ex. B.) Plaintiff argues that Carey was deliberately indifferent because she "had the opportunity to

intervene, but only replied to Mr. Nunez that he had a PCP appointment scheduled in 3 weeks." (Pl.'s SOF ¶ 45.)

Carey's decision to defer Mr. Nunez's treatment to his upcoming PCP appointment does not give rise to a constitutional claim. Carey based her decision to defer Mr. Nunez's care on a review of his medical records, which showed that he was being treated for leg and back pain, had recent unremarkable X-rays, and an upcoming appointment with his PCP. Her medical judgment to defer to his PCP, without more, cannot support a deliberate indifference claim. See Coke v. Med., Dep't of Corr. & Cmty. Supervision, No. 17 Civ. 0866, 2018 WL 2041388, at *5 (S.D.N.Y. Apr. 30, 2018) ("[A] medical professional's discretionary decisions to not refer a patient or order certain tests do not constitute the level of culpability required for a deliberate indifference claim."); Washington v. Westchester Cnty. Dep't of Correction, No. 13 Civ. 5322, 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("[I]t is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference.").

This conclusion is underscored by the fact that Carey interacted with Mr. Nunez's care on only a single occasion early in his illness. At the time of his grievance, Mr. Nunez had not yet presented with stomach pain, fatigue, fever, weight loss,

loss of appetite, and faintness.    (See Pl.'s SOF ¶¶ 48–51.)
That her involvement preceded the onset of these symptoms
indicates that she was not aware that deferring to his upcoming
PCP appointment would subject Mr. Nunez to a substantial risk of
serious harm.    Such isolated and early involvement in his
treatment does not support a constitutional violation.
Patterson v. Lilley, No. 02 Civ. 6056, 2003 WL 21507345, at *4
n.3 (S.D.N.Y. June 30, 2003) ("Nurse Eggler could only be held
deliberately indifferent to an existing, serious medical
condition, not a speculative, future medical injury.    The
requisite culpable state of mind would necessarily be absent for
the unknown, future injury."); Lloyd v. Lee, 570 F. Supp. 2d
556, 569 (S.D.N.Y. 2008) (Chin, D.) (dismissing complaint
against two prison medical providers who had seen the plaintiff
only once shortly after the onset of his symptoms because of
"their limited roles early in Lloyd's treatment").

### b. Dr. Kim

Dr. Kim saw Mr. Nunez on four occasions: on November 7,
2018 to address complaints of leg pain and constipation (Pl.'s
SOF ¶¶ 29–31); on December 5, 2018 for an earache (id. at ¶¶ 34–
35); on May 28, 2019 to address Mr. Nunez's worsening stomach
issues and pain (id. at ¶ 47); and finally on June 25, 2019,
when Dr. Kim referred Mr. Nunez to the emergency department at
Mt. Vernon Hospital (id. at ¶ 65).    Plaintiff makes no argument

that Dr. Kim deprived Mr. Nunez of adequate care at his first two encounters. Nor does she argue that Dr. Kim was deliberately indifferent when he sent Mr. Nunez to the hospital on June 25, 2019. Accordingly, to survive summary judgment, Plaintiff must demonstrate that Dr. Kim was subjectively reckless in rendering care to Mr. Nunez at his May 28 appointment.

The upshot of Plaintiff's allegations against Dr. Kim is that he failed to diagnose accurately Mr. Nunez's cancer or adequately treat the severity of his symptoms. (See Pl.'s Br. at 14-16.) Plaintiff's expert adds that Dr. Kim failed to document his May 28 visit adequately, noting that Dr. Kim's notes "lack vital signs, any weight and appear to mention low back pain but no physical examination of Mr. Nunez's back or legs." (Venters Decl., Ex. 1 ("Venters Report") [dkt. no. 80-1] at 8.)

These allegations do not demonstrate that Dr. Kim acted with deliberate indifference to Mr. Nunez's serious medical needs. The record shows that in response to Mr. Nunez's complaints—which consisted of several months of severe lower back and leg pain, numbness in his legs and feet, and stomach pain—Dr. Kim discontinued ibuprofen to alleviate his stomach issues, ordered Aleve to manage Mr. Nunez's pain, and ordered an X-ray to determine the underlying causes of Mr. Nunez's

18

symptoms.  (Pl.'s SOF ¶ 47; Defs.' SOF ¶¶ 13, 16.)  Plaintiff offers no evidence to show that Dr. Kim chose this course of treatment while actually aware that it subjected Mr. Nunez to a substantial risk of harm, nor has she pointed to evidence from which an inference of deliberate indifference could be drawn. Dr. Kim provided treatment which responded to Mr. Nunez's complaints, and "where the treatment provided is responsive to the prisoner's condition . . . 'the fact that a prisoner might prefer different treatment does not give rise to an Eighth Amendment violation.'"  Victor v. Milicevic, 361 F. App'x 212, 215 (2d Cir. 2010) (quoting Chance, 143 F.3d at 703); see also Thomas v. Wright, No. 99 Civ. 2071, 2002 WL 31309190, at *9 (N.D.N.Y. Oct. 11, 2002) (granting summary judgment for prison medical provider-defendants who failed to diagnose an inmate's colon cancer for nearly one year in part because "[h]e was seen numerous times and given various medications to alleviate his pain and suffering").

Likewise, that Dr. Kim failed to conduct a proper physical examination[6] or diagnose Mr. Nunez with pancreatic cancer does not alter this conclusion.  It is well-settled that misdiagnosis, even if negligent, does not rise to the level of a

---

[6] The parties dispute whether Dr. Kim conducted a physical exam at his May 28 encounter with Mr. Nunez. (See Defs.' Counter SOF ¶ 47; Venters Report at 8.)  For the purposes of this motion, the Court assumes that he did not.

constitutional violation. <u>See</u> <u>Green</u>, 2019 WL 1427448, at *7
("[T]he mere fact that Defendants misdiagnosed Plaintiff or
failed to recognize the severity of his medical condition—even
if their mistake was obvious or highly consequential—cannot,
standing alone, support an Eighth Amendment claim."). At most,
Plaintiff's allegations suggest that Dr. Kim was negligent in
failing to detect that Mr. Nunez's symptoms represented a life-
threatening condition, but such allegations are insufficient to
implicate the Eighth Amendment. <u>See</u> <u>Sheils v. Flynn</u>, No. 06 Civ
407, 2009 WL 2868215, at *18 (N.D.N.Y. Sept. 2, 2009) ("While
Defendants' failure to immediately diagnose the lesion on
Plaintiff's shoulder as cancer was undoubtedly frustrating and
frightening for Plaintiff, the record simply does not indicate
any behavior on Defendants' part that elevates the situation
from possible medical malpractice to the level of a
constitutional violation.").

### c. Nurse Miller

Miller saw Mr. Nunez at his housing block sick call on June
4 and June 11. By this time, Mr. Nunez's symptoms had
progressed to include back, leg, and stomach pain, fatigue, loss
of appetite, fever, substantial weight loss, and night sweats.
(<u>See</u> Pl.'s SOF ¶¶ 48-52.) Miller noted Mr. Nunez's new symptoms
and scheduled an appointment with his PCP within one week. (AHR
at 0032.) Plaintiff appears to contend that Miller was

deliberately indifferent to Mr. Nunez's medical needs because he did not immediately refer Mr. Nunez to be seen by a physician. (See Venters Report at 15; Pl.'s SOF ¶ 53.)

No reasonable jury could find that Miller was deliberately indifferent to Mr. Nunez's serious medical needs because he made a referral for Mr. Nunez to be seen by his PCP within one week rather than that same day. Drawing all inferences in Plaintiff's favor, Miller should have recognized that the onset of these new symptoms required immediate assessment by a physician. However, "the mental-state inquiry does not include an objective-reasonableness test." Salahuddin, 467 F.3d at 282. Thus, even if Miller was negligent in scheduling an appointment within a week instead of a day, such negligence falls short of supporting a claim for deliberate indifference. See Vallade v. Fischer, No. 12 Civ. 231, 2012 WL 4103864, at *6 (W.D.N.Y. Sept. 13, 2012) (delay of five weeks to see physician not actionable under the Eighth Amendment because plaintiff "did receive treatment for his injuries—in the form of x-rays, pain relief medication and a shoulder sling—and [because] he was in fact referred to and seen by an outside specialist").

### d. Dr. Bentivegna

Dr. Bentivegna interacted with Mr. Nunez's care once on June 10, 2019, when he received a letter from Mr. Nunez. (Bentivegna Decl. ¶ 9.) In his letter, Mr. Nunez indicated that

he had lower back pain for four months, stomach cramping, weight loss, loss of appetite, and fever. (Bentivegna Decl., Ex. A.) Mr. Nunez requested an MRI and to "see a doctor that knows about my condition fast!" (Id.) In response to this letter, Dr. Bentivegna "investigated his medical records" and saw that Mr. Nunez had been seen by Dr. Kim two weeks earlier and had an upcoming appointment at the end of the month. (Bentivegna Decl. ¶¶ 13-14.) Dr. Bentivegna further ordered an EMG "to determine possible underlying causes of back pain" (id. at ¶ 17) and indicated that Mr. Nunez should "follow up with his provider, at this upcoming appointment, as it was his primary care doctor who would make specific decisions regarding his care." (Id. ¶ 16.) Plaintiff maintains that Dr. Bentivegna was deliberately indifferent to Mr. Nunez's serious medical needs because he "could have expedited treatment or spoken to Mr. Nunez's provider" but instead wrote "a perfunctory letter telling him to address his issues with Dr. Kim." (Pl.'s SOF ¶ 55.)

The record does not raise a triable issue of fact regarding Dr. Bentivegna's mental state. The record demonstrates that Dr. Bentivegna reviewed Mr. Nunez's medical records, referred him to an upcoming appointment with his PCP, and ordered additional testing to assist Dr. Kim. As with the other Defendants, Plaintiff's argument amounts to a disagreement over treatment, which is "not adequate grounds for a Section 1983 claim." Sonds

v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303,
312 (S.D.N.Y. 2001).    That Dr. Bentivegna did not order
different testing or expedite Mr. Nunez's upcoming appointment
at most may suggest negligence, but "such medical judgments do
not amount to deliberate indifference in violation of the Eighth
Amendment."  Gibson v. Mount Vernon Montefiore Hosp. Exec. Dir.,
No. 22 Civ. 4213, 2024 WL 1217528, at *12 (S.D.N.Y. Mar. 19,
2024).

### e. Nurse Practitioners Ashong and Acrish

Ashong and Acrish saw Mr. Nunez on June 20 and 21,
respectively.  By this time, Mr. Nunez's condition continued to
deteriorate.  In addition to the constellation of symptoms he
reported to Miller and Dr. Bentivegna, Mr. Nunez now reported a
swollen vein on his leg, daily diarrhea, and further weight
loss.  (Pl.'s SOF ¶¶ 56–62.)  Moreover, on June 21, Mr. Nunez
fainted while at the gym.  (Pl.'s SOF ¶ 61; AHR at 0035.)

Plaintiff avers that Ashong and Acrish exhibited deliberate
indifference to Mr. Nunez's serious medical needs by failing to
evaluate Mr. Nunez properly and by not immediately referring him
to be seen by a physician.  (See Pl.'s SOF ¶¶ 60, 63; Venters
Report at 17.)  Plaintiff further maintains that both Ashong and
Acrish blew off Mr. Nunez's complaints as inconsequential
despite "the potential for these problems to represent life
threatening illness."  (Venters Report at 17.)  Indeed, both

23

Ashong and Acrish appear to minimize the severity of Mr. Nunez's illness. Ashong's note indicates that she believed that Mr. Nunez's symptoms were "all chronic" and "nothing new," and indicated there were "[n]o red flag[s]." (AHR at 0034.) Likewise, Acrish noted that Mr. Nunez's symptoms were potentially "anxiety related." (AHR at 0035.)

The actions of Ashong and Acrish do not give rise to an inference of subjective recklessness necessary to support Plaintiff's Eighth Amendment claim. The record shows that on June 20, Ashong examined Mr. Nunez, referred him to his PCP, with whom he had an upcoming appointment in five days (AHR at 0034), and ordered an X-ray on an "urgent" basis to assist Dr. Kim at his upcoming visit. (Ashong Decl., Ex. B [dkt. no. 65-2]). Similarly, Acrish conducted a physical exam of Mr. Nunez, reviewed recent X-rays, ordered milk of magnesium and Tylenol to alleviate his symptoms, and referred him to his upcoming PCP visit. (Acrish Decl. ¶¶ 15-19; AHR at 0035.) Acrish further authorized Mr. Nunez to have meals in his cell and relieved him of work duties until he could see Dr. Kim. (Id.) In sum, both examined the patient, ordered tests, prescribed medication, allowed him rest, and deferred to Mr. Nunez's PCP, with whom he would see in a matter of days. This may not have been the care that Plaintiff would have preferred, but such medical judgments

do not support a claim of deliberate indifference. Gibson, 2024 WL 1217528, at *12.

This finding is supported by the fact that both explicitly minimize the severity of Mr. Nunez's symptoms in their notes. (See AHR at 0034 (Ashong's note indicating "nothing new" and "[n]o red flag[s]"); AHR at 0035 (Acrish's note suggesting Mr. Nunez's symptoms were "anxiety related").)  To support a claim of deliberate indifference, Plaintiff must demonstrate that both were actually aware that their course of treatment would subject Mr. Nunez to a substantial risk of serious harm.  That Ashong's and Acrish's contemporaneous notes both reflect that they believed, perhaps callously, that Mr. Nunez was exaggerating his symptoms is strong evidence that they lacked the requisite culpable mental state.  Cf. Melvin, 2019 WL 1227903, at *11 ("[A]lthough [defendant's] alleged statement accusing Decedent of "faking" his pain may arguably demonstrate a lack of empathy, it also permits the inference that [defendant] genuinely believed that Decedent's health was not at risk."); McClinton v. Connolly, No. 13 Civ. 2375, 2014 WL 5020593, at *5 (S.D.N.Y. Oct. 8, 2014) ("If [defendants] believed Plaintiff's asthma attack was a mere ruse, they could not have been aware of a substantial risk that Plaintiff would suffer serious harm.").

                    *              *              *

In conclusion, Plaintiff has failed to raise a triable issue of fact as to the subjective element of the deliberate indifference analysis. Nothing in the record demonstrates that any Defendant acted or failed to act while actually aware of a substantial risk to Mr. Nunez's health or safety. Accordingly, Defendants' motion for summary judgment is granted, and Plaintiff's claims for deliberate indifference are dismissed.

**B. Qualified Immunity**

Defendants next argue that they are protected by qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Where a defendant asserts a qualified immunity defense on summary judgment, the court must assess 'whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right,' and, if so, 'whether that right was clearly established at the time of the alleged violation.'" Jackson v. Kaufman, No. 13 Civ. 6544, 2015 WL 5521432, at *13 (S.D.N.Y. Sept. 18, 2015) (quoting Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010)). "A court may consider these two questions in either order and, if it

26

determines that one prong is not satisfied, it need not reach the other." Green, 2019 WL 1427448, at *10.

With respect to the first factor, the Court has determined that Plaintiff has failed to demonstrate the existence of a genuine issue of material fact regarding whether Defendants violated Mr. Nunez's Eighth Amendment rights. For the same reasons, the evidence, viewed in the light most favorable to Plaintiff, is not capable of "mak[ing] out a violation of a statutory or constitutional right." Tracy, 623 F.3d at 96. Defendants are thus entitled to qualified immunity on Plaintiff's deliberate indifference claims. See Jackson, 2015 WL 5521432, at *13 (S.D.N.Y. Sept. 18, 2015) (finding defendant entitled to summary judgment on the issue of qualified immunity where plaintiff failed to establish that defendant violated his constitutional or statutory rights); Green, 2019 WL 1427448, at *10 (same).

### C. Plaintiff's Motion to Preclude

Finally, Plaintiff moves to preclude the report of Defendants' expert, Dr. Mark Korsten. (Pl.'s Br. at 21.) Plaintiff argues that Defendants' expert report (Korsten Decl., Ex. B ("Korsten Report") [dkt. no. 68-2]) is inadmissible pursuant to Federal Rule of Evidence 702 because his testimony is not the product of reliable principles and methods. (Pl.'s Br. at 21.) Specifically, Plaintiff objects that Korsten

repeatedly opines that Defendants did not deviate from the standard of care without first establishing the relevant standard of care. As Defendants' expert failed to lay the proper foundation, Plaintiff argues the report must be precluded.

The Court denies Plaintiff's motion to preclude as moot. As discussed above, the dispositive issue in this case is whether Defendants acted or failed to act with a sufficiently culpable mental state, i.e., while actually aware of a substantial risk that serious inmate harm would result from their prescribed course of treatment. Korsten's opinion that Defendants did not deviate from the standard of care sheds little light on Defendants' mental state. Thus, the Court need not, and has not, relied on the Korsten Report in rendering its decision. As the report played no role in the Court's decision, the Court need not determine the admissibility of the proffered testimony. See Williams v. Broome Cnty., No. 07 Civ. 0200, 2009 WL 5102258, at *5 (N.D.N.Y. Dec. 17, 2009) (denying motion to preclude expert report as moot "because the expert's report in question cannot create an issue of material fact with regard to the subjective element—deliberate indifference—in Plaintiff's inadequate-medical-care claim under the Eighth Amendment").

## IV.  Conclusion

For the reasons discussed above, Defendants' motion for summary judgment [dkt. no. 61] is GRANTED, and Plaintiff's motion to preclude [dkt. no. 75] is DENIED.  The Clerk of the Court is directed to close the open motions at Docket Entry Numbers 61 and 75, to mark the above-captioned case as closed, and to mark all pending motions denied as moot.

**SO ORDERED.**

Dated:    August 7, 2024
          New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge